May it please the court. I'm James R. Dole. I represent the appellants. I'd like to reserve eight minutes. We're here because the agency appellate panel made a mistake, and we're asking... sole proprietors used to remain sole proprietors rather than incorporate just so that they did not have to pay workers' comp premiums on themselves. If they incorporated, then they had their corporation employ themselves. They became employees and had to buy workers' comp. They'd stay sole proprietors or partners, no workers' comp. Is that true here? Your Honor, I'm a business lawyer mostly. That's exactly the kind of consideration that I give to my clients in terms of whether or not to incorporate. Now obviously... It is true here. It is. So unless these people incorporated, these minors incorporated, they would not have to pay workers' comp on themselves. That's exactly correct. But if I understand it right, the agency said, well, we have to count the price of workers' comp premiums. That's exactly correct. Okay. Let me just tell you from the beginning what my issue is, which maybe you can help me with. As I understand the law in this area, and this is not my area of expertise, the standard cases say that because the prudent person standard is objective, it doesn't actually matter what the specific plans of the individual applicant may be. And secondly, that we are to view with disfavor claims to deprive the United States of title to land. If you apply those principles, why are you still entitled to prevail? Well, Judge, the fact of the matter is here, we... I'm sorry. Could you repeat the question, the first part of your question? It's kind of a complicated question. I apologize. But it seems to me there are two principles that the cases establish, one of which is that claims against the government of this type are to be viewed with disfavor, and they have to be proved by the claimant. And the second piece is that the standard for a prudent minor is an objective standard, so that it doesn't matter what the specific plans are of the individual, whether they want to pay below-market wages or use all their nephews and nieces who are doing it because they love their aunt and uncle or whatever it is. Because it's an objective, prudent person standard, that doesn't matter. We have never taken the position that our case hinges upon what the waters specifically themselves intend to do. This case has always been based upon what that hypothetical, reasonable minor would intend to do. So in that respect, our position would be consistent with yours. We're trying to pursue an objective evaluation of our mining plan. And, again, it doesn't matter whether this is the waters or anybody else. I think that that's the point that we've consistently made throughout this proceeding. All you're asking for is essentially a remand to the ALJ so that you can determine what these added costs would be for a mom-and-pop operation. At a minimum. Of course, the dissenting judges of the IVLA panel say that that's what my clients are entitled to at least, if not in addition to that, dismissal of the contest. And, again, this is why the ALJs, the two authors of the original decision, made it very clear to point out that what they're suggesting is not the patent issue at this point in time, but at least my clients would be entitled to another hearing in order to make sure the record is resolved as to that. Just on the government's prima facie case, not on the patent issue. Exactly. Exactly. And, again, our position has consistently been that we've overcome the prima facie case to the extent that at a minimum it requires dismissal of the contest. Nothing would preclude the United States from reinstituting the contest if it so chose. The only result is that my client's mining claims would not be invalidated. At this point. At this point. There's no guarantee what the ultimate outcome would be. They could start all over again, and the government can say that here's the cost. You'd have these start-up costs. You'd have these overhead costs. Just not apply the 25 percent. That's correct. May I say, you objected before the administrative law judge to the document containing the 25 percent, and that came in at the very, very end, correct? And the administrative law judge's disposition was not to have to deal with that because he thought the other two areas did not have, there wasn't gold in the other two areas. Let me try to answer the question that I think you're asking. I hope I do that. What I'd ask the court to do is to look at that Exhibit 35 and compare it in terms of the labor cost and compare it to what the ALJ, Judge Schweitzer, did with that labor cost. For example, with respect to the dredge rates, the labor rate applied to the creek reserve component of the claims, remember that what Judge Schweitzer did was say my client's labor rate was considered reasonable. That rate was higher than what Exhibit 35 indicated. And what Judge Grant and Judge Irwin did in their initial decision was take my client's labor rate, which again was even higher than the mineral examiners, take that and add a 25 percent to that factor. So in effect, as to that labor rate, you've got something that neither party argued. It was higher than anybody had argued at all in these proceedings. Let me check something here. If I understand it right, this is a small claim. Placer mining is it? Correct. Suitable for mom-and-pop exploitation, not suitable for one of the big international gold mining companies. And if I understand it right, even taking the labor charges that are attributed to the mom-and-pop, who are going to be the miners, they still get 12 cents per loose cubic yard of material in profit, so long as you don't take that 25 percent overhead on top of it. Is that right? That's correct. So you add the 12 cents per loose cubic yard to the $18.75 an hour that they're valuing their labor at, and they make $40,000 a year out of the mom-and-pop mining of this little Placer mining plant. Is that right? Correct. That's basically what the dissent at the agency appeal level was saying. Correct. What I point out is that the… What happens if you take the 25 percent, then they actually are still going to be making money. They don't really lose money. They just lose money if you value their labor at a higher rate than they do. Correct. In effect, what's happening is by saying that the claim is unprofitable, what the United States is really saying is that it's not giving the miner enough of an individual economic expectation to pursue the venture. So you're only making $30,000 a year and doing the kind of labor you could do if you did it for a better mine, you could be making $40,000 a year. That's my understanding of what the reasoning was. Correct. And I point out that the argument of the United States is that even if we assume that there was an error, it shouldn't make any difference because the waters are still going to lose money. And I think if you look at the record, that's just simply not the case. I think the only way that you can get there, and if you read even the majority decision of the IDLA, I think it's consistent with this point, is the only way that you can come to the conclusion that the claim is reasonably likely to lose money is in the event that you include reserves that are probably not going to be economically beneficial. In effect, what I understand the United States argument to be is we're going to make you mine portions of the claim that are going to lose money so that your claim is going to be invalidated. And there's nothing in the mining law that requires you to do that. You can select the segments of the claim that are appropriate to mine, pursue those, and then until you've done further prospecting or whatever else you think you need to do, price of gold goes up, mining costs go down, whatever it may be, you don't need to include those reserves in order to, number one, to substantiate your patent application. You have to apply this 1875 an hour to mining dirt that has only trace amounts of gold in it. You do not have to do that. But the government is saying you do. That's my understanding of their argument in terms of how they get to this position that even assuming that our argument is correct, the waters would still lose hundreds of thousands of dollars. I don't believe that that's justified at all in this record, and I don't think that even the majority of the IVLA endorsed that kind of reasoning. They simply suggested that the arguments of the United States might cast doubt. Well, with all due respect to the agency, we're not in a cast doubt standard. We're in a preponderance of evidence standard. And here, as the IVLA dissent made clear, we've got under our analysis, under the findings of fact that we made in our initial decision, if we correct it for this inadvertent error that we've made, then it looks like at a minimum what the mining claimants are entitled to is dismissal of the contest. They may not be entitled to patent yet. They may never be entitled to patent. What is your response to the majority statement that you had an opportunity at the hearing to offer your own estimates of labor overhead and did not choose to do so? That's an excellent question, Your Honor. I think that, again, what you need to do is to look very carefully at Exhibit 35. And you'll see from Exhibit 35 that the mineral examiner himself was arguing, was opining that the labor rate that should apply here was somewhere, even with the 25% surcharge, was going to be within the range of what the water's labor rate was. It was included in their supplement. Again, the waters were saying $13.75 an hour for a heavy equipment operator, $5 an hour for a general laborer. If you go through Exhibit 35, you'll see that the mineral examiner broke that down in terms of the kind of labor rates that he would charge based upon the species of reserves that you're talking about. Let me see if I understand your answer. Your answer is you didn't offer separate evidence because you were happy to rely on Exhibit 35? No, because we were happy to rely on the evidence that we'd submitted, which was not in any way inconsistent with Exhibit 35. Again, you need to remember that what the IVLA... Was there labor overhead in your exhibits? In other words, is this factually incorrect that you did not offer labor overhead statistics? I don't believe there's any ability for this court to make that conclusion, that it's not included in that. I don't understand your answer. I don't think labor overhead is real statistics, is it? That's correct. It's just an attribution of a hypothetical percentage. Correct. What the argument of the United States is is that you have a particular hourly wage rate to which you add a labor overhead cost component. What our argument is is that we have a valuation of labor, which is set forth in the supplement to our patent application. It says we expect the value of our labor to be at $13.75 an hour for a heavy equipment operator and $5 an hour for a general laborer. Our position at this point in time is that there's nothing to indicate that the labor rate that Judge Schweitzer relied upon, which was based on an Oregon statistical wage summary, didn't already include that factor. The fact of the matter is, is on our cross-examination of the mineral examiner, he made clear that that 25% factor doesn't even apply here. If you take that 25% factor out of the numbers that he was using in Exhibit 35, there you've got a number that's probably artificially low. You go back and you look at our number, and that's the number that Judge Schweitzer called reasonable. Let me make sure I follow this. You're saying that the Schweitzer number is what labor costs you. It's not the hourly wage that labor gets, and the what labor costs you number includes the fringes that the government requires you to pay. The fact of the matter is the record's not clear on that. Again, what our mineral application did was rely on this 1990 Oregon statistical wage rate summary, and the record is not clear at this point in time that that doesn't already include that 25% factor or what the factor would be. Here again, we'd be talking about the fringe benefit factor. We're not talking about unemployment taxes, workers' compensation, and Social Security. We're talking about the idea that there might be additional fringe benefits that would be necessary in order to value the mining claimant's personal time. I have a completely different question. There's some discussion that only deposit D or area D, I don't know what the proper way to refer to that is, has substantial gold in it and that the other areas have a whole lot less, if any. Is there some minimum amount of ground that has to have gold in it for the patent application to be accepted? Do you understand my question? In other words, if you have 500 acres and there's 4 feet by 4 feet that has something in it, does that enable you? In other words, you've argued that they should ignore these other areas because by including these other areas, that's what shows that you lose money because the other areas don't have much. What is the law about whether that's a legitimate tact for you to take? The question is really, it's an excellent question. The basic, my understanding of the way the rule has always been is that you have to break certain mining claims up into, honestly, I don't recall whether it's a 10-acre parcel or a 20-acre parcel. I don't think it's a 160-acre homestead. No, no, no, no, no. It's a much smaller parcel. Correct. You've got to at least, as we say, show colors in those various components of the claim. You don't have to show that there's a discovery in each and every square foot of the claim. No, I understand that, but I'm trying to understand the legal basis for your saying that these other areas should be disregarded in determining whether it's profitable to mine the claim. All I'm saying is that if you have an area that's rich and an area that's less rich or, on the other hand, is more costly to mine, you don't have to go mine that area in which you're going to run much less likelihood of making money. Now, the factor will come in in terms of whether you are going to expend an excessive amount of capital and things like that to make that relatively smaller area justify that relatively larger capital expenditure. The idea is can you spread your capital investment over a... I think this focuses on something different, and that is nobody wants mining claims to be used to get property from the United States in order to build suburban subdivisions. Or sell the timber, which I gather there's quite a bit of valuable timber on this property. However, the mining law of 1872 was designed to create incentives not to discourage acquisition of land for mining. The way I recall it, the amount of land that you get in a claim is quite limited. It's basically the area that you can exploit profitably for minerals plus a reasonable area for equipment, cabins to live on, whatever else is needed in order to accomplish the exploitation in a reasonable way. I can't remember the acreage amount. Do you remember the acreage? I want to say it's 10 acres or 20 acres. Mr. Starr probably knows better than I. I can't remember, but I remember. But you at least have to show a minimal amount. Again, this concept you've got to show colors. Not just the area that you're going to exploit for the mining, because you're allowed for an area for the surface uses that are going to be necessary. Correct. Let me follow this further, though. You have areas A through E in this case. You want us to look at area D, because that's where the most gold is, if I remember correctly. If you could prove your case only for area D, you'd get a little bitty piece. If you could prove it for everything, then you'd get the whole area. Your application was for the whole area, so why shouldn't they take that at face value and say, if you're making a claim for the big parcel that's dependent on areas A through E and you have to consider them all? I guess I don't understand what's wrong with that. It would really do irreparable damage to the mining law, the whole concept behind this. If you require the mining claimant to show that you're absolutely going to be profitable on every square foot, even if there's obviously a variety of different physical conditions that might exist out there, if that was the standard, it would be extremely difficult in many, many circumstances for anybody to ever be entitled to patent in the first place. Again, that's why this rule is a lower standard. You've got to show overall profitability to meet the prudent person test, but in order to get patent... And overall profitability would include areas A through E, because that's what you're asking. But it doesn't require that you mine those areas that are not economic. If we had, in effect, a dry hole, there's nothing that requires us to burn up every last nickel that we have to prove that it's a dry hole, when 50 yards away, we've got an extremely rich resource. I see my time is up. Would I be permitted to have any rebuttal time? I see that I've gone far beyond. I think you should plan on having one minute for rebuttal. Very good. Thank you. May it please the Court, my name is John Starr, representing the United States, and with me at council table is Mr. Eric Nagel with the Office of Regional Solicitor. Judge Kleinfeld, I'll start with your initial question. I have no reason to dispute what's in Oregon law as far as whether these things should be paid or not, but that's not our point. We've never argued that one way or the other. Our point is that the IBLA here, relying on its own longstanding precedent, applied an objective prudent person test, and under that you do not look at the subjective intent of an individual miner. Well, I don't think my concern is quite clear to you. I know in Oregon they're concerned with whether these mining claims are just excuses to steal land or steal trees or something like that. In Alaska, it's a major industry, mom and pop gold mines. There are some areas, like a place called Fort Knox, it's one of the biggest gold mines in America, right near my house. And there are lots and lots of others that just aren't big enough for an international company to put the capital into, but they provide good livings for single men, couples, families, maybe a family with a few hired hands. Gosh, I know some of those people. Some of them make six figures. Our point is if it's that kind of mine, if it's a real small mine, one that you're not going to use hired help for, there's just no reason why you would incorporate and pay workers' costs. Our point is that in assessing whether there's a valuable mineral deposit under the mining law of 1872, the board has in the past, and in this case, continued to apply an objective standard. Rather than look at each of those mining claimants individually, you look at- But that is objective. I mean, if it would be plain stupid to buy workers' comp as opposed to just using your medical insurance that you have as an individual, then under an objective standard, people aren't going to be plain stupid. If it's too small a mine to use a lot of hired help, then people are going to just do it themselves. To do that, though, you have to look at the subjective intent of each miner, what the miner says. This is a mine suitable for one or two people, no more, a mine profitably. In that case, the reasonable miner would ordinarily not buy workers' comp insurance because it would just be duplicative of whatever health insurance you have. Topography, geography, that would certainly go to whether a large mine operation or a small mine operation would apply. To that extent, you're looking at objective factors. You're looking at the claim, not the claimant. You're looking at whether the claim has ridges, it's narrow, you can only use small equipment, only one or two laborers. That's looking at the claim, not the claimant. That's right. What the Waters test would do is require the board and the courts to look at the claimant and whether they're able to carry out their own mining, what they state their subjective intent is, at least at the time that they make their claim. You and I may have to agree to disagree on that. I'm talking about a claim rather than a claimant that's only suitable for exploitation by mom-and-pop claimants. Let me ask you something about the claim, though. What's the law? I can't remember it on the size of mining claims. It's a 10-acre rule. 10-acre rule. Yes. What was looked at here were the discovery points and the sampling points recommended by the Waters themselves. The agency always cooperates on that type of thing as to where the sampling is done. Those were spread at different points around the 50 acres. Can I make sure I understand how this whole thing progressed over its long, somewhat tortured history? Yes, Your Honor. The government brought a case, a contest, saying that they couldn't mine this in an economically reasonable manner, correct? Correct. And the way that works is you have to make out a prima facie case, and then they have to rebut the prima facie case. Correct, Your Honor. But their rebuttal is limited to the elements of your prima facie case, correct? That's correct. Did your prima facie case include workers' compensation? Yes, Your Honor. The prima facie case was based on Exhibit 35, which is the supplemental minimum. That came way after you brought the case. That came right at the very end. It came during the hearing while the government was – it came during the second hearing while the government was presenting its case. The Waters had the opportunity to question the examiner during that hearing to present – Well, they objected to it. Did they object it? They objected to it, but ultimately some things were removed after a discussion among counsel. Some things were removed from that report, and then it was admitted after the removal of those items, subject to hearsay and other things going to weight. And in this appeal, they don't raise that issue that Exhibit 35 was improperly admitted. What did Judge Schweitzer decide as to Exhibit 35? Judge Schweitzer admitted Exhibit 35. Then when he did his valuations himself and his holding, he did not address overhead costs. Okay. So there's no determination by the trial judge as to the overhead, correct? That's correct. Absolutely. So basically he said because two of these – I don't know the proper word, but out of the three parts that could be mined, two of the parts couldn't be mined profitably, right? He said there was not a valuable mineral deposit, even – On two of the three. Even – I believe that's correct. Okay. So now it goes to the IBLA, and the IBLA says no – The IBLA has de novo review. Right. And they say, no, you're wrong. You can mine all three parts, correct? Yes. Actually, if I could go back. Judge Schweitzer said you can mine one part, but not the other two. Right. I'm sorry. No, you're not. Yeah. Now the IBLA said – You can mine all three? You've got to look at all three. And they say, but nevertheless, what did you lose? Because we'll now take into account this 25 percent. Among other reasons. Among other reasons. But they did take into account at that point with their de novo review authority, they looked at Exhibit 35, concluded it was the best evidence as to the overhead costs. Let me get something about that. The mining claim under the law is 10 acres. So if you've got a good mining claim, it's 10 acres. If you don't, it's zero acres. The mining claim is not a half acre or three-quarters of an acre or wherever the oil deposit is. Well, if the mining claim is 10 acres, if it's a good claim, and if it can be exploited profitably by exploiting the half acre that has the richest deposit, I don't see what the justification is for saying in order to determine whether you can exploit it profitably, we're going to project the labor costs over mining the whole 10 acres, including the nine-and-a-half acres that has no gold. It's supposed to be objective, and no reasonable miner would spend the labor costs mining the nine-and-a-half acres with no gold. The IBLA did not get into that type of 10-acre question, to be honest with you. That's basically how they made their judgment about the profitability. All three types of gravels, and determine the labor costs, and add the 25% overhead charge to that. Their judgment is, if you mine the areas that are unprofitable to mine, then it would be unprofitable. Within the 10-acre mine. I'm sorry, I didn't quite understand the question. They held that all three would be unprofitable, all three areas. The virgin gravel, the streambed gravel, all three would be unprofitable. With the 25% overcharge. In addition, when you get to the next IBLA decision, the board, the majority there said, even without the overhead charge, the BLM had cast considerable doubt on whether there would be profitability in any case. The waters rely on the descent, that's not the decision of the board, of course. The descent left out a lot of things. The descent just passed over in mentioning self-employment tax of 15.3%, even if there was no overhead charge. They mentioned that in one sentence, didn't apply it in any respect. Well, that depends upon the ultimate profit, it's 15%. That's correct, Your Honor. It's a Schedule C, and then you plug that into your 1040. That's correct, Your Honor. So it depends upon the ultimate profit. That's correct, but the waters made no showing of that at any stage of these proceedings. No offer of proof, nothing during the hearing. I come back to this, and here's my concern about the fairness to the waters. Where did your agency, the BLM, is it? BLM, yes, Your Honor. Where did they, in their prima facie case, say that it's unprofitable to mine because you would have this expense, that expense, A, B, C, D, E, et cetera? That's in the two mineral examiner's reports. There's the initial one, which admittedly did not address overhead at all. And then there's 35. And then there's Exhibit 35, where the examiners, the supplemental report did address overhead, as well as all the other factors and went through a whole cost analysis to determine that there was not a valuable mineral deposit. And along with the testimony that went with that, that's the prima facie cases. But what stage did that come at? That came at the very end, right? Not in the beginning. It came during the second hearing when the government was putting on its case. I'm sorry, the waters still had their chance to respond to that, both through cross-examination, putting in their own evidence, having their own witnesses testify and come up with a rebuttal to the 25 percent figure. They didn't do any of that. They never asked for it. They never presented an ounce of evidence on that. And since then, they've never made any offer of proof. Rather, they just continued to make the all-or-nothing approach, that it doesn't apply at all. And because we say it doesn't apply at all, that gets you by the substantial evidence. It refutes the prima facie case. Their entire brief is based on that one point. So basically, if they're going to pay overhead that includes workers' comp, that's your prima facie case? Social Security, workman's comp. But you don't have a prima facie case element for this if it's a mom-and-pop operation? No, we don't agree with that. If you should disagree with us on overhead, we think the case still needs to be remanded to the agency because it's the agency's position that even without overhead, this is unprofitable. I understand that, but to the first part, does it get remanded? And would you agree that if you look at it in terms of a mom-and-pop operation, that the BLM didn't put forth a prima facie case that they had to refute as to what the overhead expenses would be? That needed to? No, no, the agency did put forth a prima facie case. And there's a low-threshold standard for prima facie case. Basically, if you look at Laura v. Secretary of the Interior and the Helvick cases, it's that the examiner testifies that he did an examination, prepared a report, and concluded that there was not a valuable mineral deposit. But in the initial examination report, there's nothing about the overhead. That's correct, Your Honor. And the Waters never asked about that either. But the fact that that was not in the initial report does not invalidate the later report, which was more comprehensive and more inclusive. But that's the 25 percent figure. That's correct, Your Honor. If we say they were wrong for choosing – there's two objective standards. One is mom-and-pop and one is big corporations, you know, Minnesota mines. And they were wrong for choosing 3M as opposed to mom-and-pop. What's the result? Well, what they're trying to do is subdivide mom-and-pop into a mom-and-pop that hires some people and a mom-and-pop where the claimants state that they intend to do it. Well, they've got to hire that. Was it the backhoe operators? Suction dredge operator. I mean, that's hard work. I might point out the Waters are in their mid-70s and mid-60s here. I think what you're going to do is get the board and the court into questions about the ability of claimants to actually do the physical labor here. And that's why the board applies to them. But isn't that a subjective issue? That's exactly right. We don't get into it. That's our point. The test is an objective one, as held by the board in Clauser and Miller, that even for mom-and-pop operations, you look at what a reasonably prudent miner would do, taking into account labor, and you look at that in no way different as if you were to go out and hire the labor yourself. That's in those two opinions. It's what the board majority applied here. The dissent wants to step away from that. I might say the dissent in the initial opinion, the dissenter relied on what he called long-established precedent, including Clauser and Miller. What the dissent wants to do now is step away from that, and the majority of the board just didn't agree with that. Close, pretty close. It was five to four. Close, but still the majority speaks for the board. What the dissent wants to hold is that as a matter of law, you can never consider overhead costs in these circumstances. That's not the precedent of the agency. Well, you can never consider overhead costs that a corporation would have or a business entity would have. Or even that a mom-and-pop would have. If a person, this is a question more about your procedures or your interpretation than it is about this particular record. If you assume, as some of the questions have, that an individual mine operator would not choose to purchase workers' compensation insurance, is there some procedure by which you substitute individual medical insurance to cover the costs of illness and injury that might be related to on the job? And is that any cheaper for individuals to purchase than self-insuring for a workers' comp? I'm not aware of any procedure like that, Your Honor. Well, I just wonder whether it makes any difference, because it would seem that there's going to be some kind of work-related insurance that economically has to be built into it to determine profitability, whether it's self-insured, insured with Blue Cross, or insured with SAFE Corporation. It seems like if you get run over by a backhoe, it's going to cut into your profits whether one way or the other. So I guess I wonder why it makes any difference if you label it workers' comp or work-related injury cost. That's a good point. That's not one we've briefed, but I think that illustrates where the objective test comes in. And that's why you have to do it as an objective, reasonable person standard rather than looking at the circumstances of a particular claimant. So I think that's a valid analogy, certainly, here. But if we disagree with you and we think that the mom-and-pop standard is the appropriate standard, then all they get is a remand. That's correct, Your Honor, and it would be a remand to the agency, to the VLM. I'd like to give you a hypothetical. Suppose people plan to mine a mining claim, and they would consider it, I would think if they're economically rational, they would consider it, they'd be indifferent to whether they took their money as wages from a corporation they established, or if they took their money as profits from a sole proprietorship or partnership, or if they took their money as dividends, and they would just make the decision on what would have higher accounting and tax expenses and what would have the best bottom line for them. Am I right so far? I think so, Your Honor. Again, that's going to individual characteristics. It looks to me as though using the government's numbers, they can work this mine making no net profit after paying themselves about $18 an hour. Is that right? That's not quite right, Your Honor. We've argued and we did on reconsideration that this would not be profitable in any case. We haven't put a lot of those numbers in our brief. It's by attributing value to their labor. They don't actually have to write checks to themselves. They're indifferent to whether they write checks for themselves or wages. That's correct. It's the agency's position, though, that even excluding that, this would not be a profitable operation. I don't think you put on evidence that even if they worked for free, it still wouldn't be worth it. I don't think so. I think that the way you put on evidence that it wouldn't be profitable is assuming that their labor is worth $18 an hour roughly. It wouldn't be profitable. But it strikes me that a lot of people would be very glad to own a job where they make, what does that come to, around $40,000 a year, without making profit on top of it. I mean, I'm thinking of just a hypothetical rational miner deciding whether to mine a claim. And he says, well, I can make $40,000 a year or I can make $20,000 a year in wages and $20,000 a year in profits and my wages will be low but I'll still make $40,000 a year. So I don't care what you call it. Just call it whatever the taxes will be lowest on. But $40,000 a year in rural Oregon sounds to me like something a reasonable miner would do. I don't mean to sound like a broken record, but, again, that's a personal choice that each claimant would have to decide on his or her own. And the objective test is designed to get away from individual choices like that. No, I think the objective test is designed to get away from the guy who says, look, I love mining and I'm willing to mine even if I only make $8,000 a year off it. You still have to show under the statute that there's a valuable mineral deposit. But that seems to be undisputed. This area has been mined since 1854. And while you couldn't mine the whole 10 acres profitably, it seems to be undisputed that there's a portion of the claim that you can mine quite profitably. The agency disputes that. And I might add it has been mined extensively. And this claim was sold by an experienced miner for only $2,500. It's your position in part that it's basically been mined out, that there's nothing much left there. Is that part of it? I think that's correct, Your Honor. Part of it, anyway. Pardon? Part of it. Well, even Area D, the agency disputes that that could be profitable. The dissent focused on that. But the dissent, again, ignored self-employment tax, 15.3%, ignored the 10% contingency which the water zone witness had brought up for various costs. Are we up here on that, on this appeal, or if we remanded it? You'd have to remand. Remand. I guess we're talking about things that I'm thinking if we remanded it, then the agency could basically decide whether this is a worked-out mine or still a mine worth mining. Well, we're up here on the 25% overcharge. If the court does not agree with us, then it would have to be remanded. Then you decide whether it's just mined out. That's correct. And with all the startup costs and all those other costs. Exactly. Exactly. If the court has no further questions, I thank you. Thank you, counsel. If I could just make a couple of brief points. I'd like to clarify that no time did Judge Schweitzer, in his decision, rule that those other two areas of reserves could not be economically mined. What his ruling was is I can't even consider those, whether they can be economically mined at all. Again, Judge Grant and Judge Irwin reversed him on that and then went on to create the issue that is presented before the court today. The other issue that I want to speak to just very briefly is the fact that we've been criticized quite a bit for what the IBLA majority says is a steadfast refusal to provide evidence. And that's just simply not supported at all by this record. No less than three times during the course of both the ALJ hearings as well as before the IBLA, we asked for the opportunity to introduce new evidence. Not specifically on this labor overhead factor because, again, we had prevailed on that issue. And all three times, including the denial of the petition for reconsideration, that request was denied. The first time was at the point where we asked for the hearing at which Exhibit 35 was first introduced. Judge Schweitzer said no, and then he changed his mind. Again, if you read the first IBLA decision, you'll also see that we asked for additional opportunity to present some economic evidence, and that, too, was denied. So we've asked repeatedly to be provided an opportunity to make this record complete, and at each instance we were denied that opportunity. Thank you. Unless you have any further questions, I'll conclude. Thank you, counsel. Waters v. Jassy is submitted.
judges: Kleinfeld, Graber, Moskowitz